THOMAS P. CROWELL, GARNISHEE OF THE CHESAPEAKE AND DELA-
WARE CANAL COMPANY v. JOHN RANDELL, JUN.

RICHARD SHOEMAKER, GARNISHEE OF THE CHESAPEAKE AND DELA-
WARE CANAL COMPANY v. JOHN RANDELL, JUN.

The twenty-fifth section of the judiciary act of 1780, confers appellate jurisdiction
in the supreme court from final judgments and decrees in any suit in the highest
court of law or equity of a state, in which a decision in the suit could be had, in
three classes of cases: first, where is drawn in question the validity of a treaty or
statute of, or an authority exercised under the United States, and the decision is
against their validity: secondly, where is drawn in question the validity of a stat-
ute of, or an authority exercised under any state, on the ground of their being re-
pugnant to the constitution, treaties or laws of the United States, and the decision
is in favour of such, their validity: thirdly, where is drawn in question the con-
struction of any clause of the constitution, or of a treaty or statute of, or commis-
sion held under the United States, and the decision is against the title, right, pri-
vilege or exemption specially set up or claimed by either party under such clause
of the said constitution, treaty, statute or commission. The section then goes on
to provide that no other error shall be assigned or regarded as a ground of reversal
in any such case as aforesaid, than such as appears upon the face of the record,
and immediately respects the beforementioned questions of validity or construc-
tion of the said constitution, treaties, statu   , commissions or authorities in dis-
pute.

In the interpretation of this section of the act of 1789, it has been uniformly held,
that to give this court appellate jurisdiction, two things should have occurred and
be apparent in the record: first, that some one of the questions stated in the sec-
tion did arise in the court below; and secondly, that a decision was actually made
thereon by the same court in the manner required by the section. If both of these
do not appear on the record, the appellate jurisdiction fails. It is not sufficient to
show that such a question might have occurred, or such a decision might have
been made in the court below. It must be demonstrable that they did exist, and
were made.

It has been decided, that it is not indispensable that it should appear on the record
in totidem verbis, or by direct and positive statement, that the question was made,
and the decision given by the court below on the very point; but that it is suf-
ficient, if it is clear, from the facts stated, by just and necessary inference, that the
question was made, and that the court below must, in order to have arrived at the
judgment pronounced by it, have come to the very decision of that question as
indispensable to that judgment.

A review of the cases of Owings v. Norwood's Lessee, 5 Cranch 344 (2 Cond.
Rep. 275); Smith v. The State of Maryland, 6 Cranch 281 (2 Cond. Rep. 377);
Martin v. Hunter's Lessee, 1 Wheat. Rep. 304 (3 Cond. Rep. 575); Inglee v. Cool-
idge, 2 Wheat. Rep. 363 (4 Cond. Rep. 155); Miller v. Nichols, 4 Wheat. Rep.
311, 315 (4 Cond. Rep. 465); Williams v. Norris, 12 Wheat. 117, 124 (6 Cond

Rep. 462); Hickie v. Starke, 1 Peters's Rep. 98; Wilson v. The Black Bird Creek Marsh Association, 2 Peters's Rep. 245, 250; Satterlee v. Mathewson, 2 Peters's Rep. 380; Harris v. Dennie, 3 Peters's Rep. 292, 302; Craig v. The State of Missouri, 4 Peters's Rep. 410; Fisher v. Cockerell, 5 Peters's Rep. 256; The Mayor of the City of New Orleans v. De Armas, 9 Peters's Rep. 234.

In order to bring a case for a writ of error or an appeal to the supreme court, from a court of the highest jurisdiction of any of the states, within the twenty-fifth section of the judiciary act; it must appear on the face of the record: 1st, That some one of the questions stated in that section did arise in the state court. 2d, That the question was decided by the state court, as required in the same section. 3d, That it is not necessary that the question should appear on the record to have been raised, and the decision made in direct and positive terms, ipsissimis verbis; but that it is sufficient if it appears by clear and necessary intendment that the question must have been raised, and must have been decided in order to have induced the judgments. 4th, That it is not sufficient to show that a question might have arisen or been applicable to the case, unless it is farther shown on the record that it did arise, and was applied by the state court to the case.

IN error to the superior court of the state of Delaware.

In 1829, John Randell, Junior, the defendant in error, instituted an action of covenant against the Chesapeake and Delaware Canal Company, in the superior court of the state of Delaware, on certain articles of agreement entered into between him and the defendants, relative to the making of a canal to unite the waters of the river Delaware with those of the Chesapeake Bay, and to pass through the states of Delaware and Maryland. The Chesapeake and Delaware Canal Company were incorporated by laws passed by the states of Pennsylvania, Delaware and Maryland; and the board of directors of the company was established in the city of Philadelphia.

The declaration alleged sundry breaches of covenant on the part of the defendants, and after various pleadings and demurrers, and issues of fact, judgment was rendered for the plaintiff on some of the demurrers, and an inquisition of damages awarded. The parties went to trial on some of the issues of fact, which were found for the plaintiff; and on the 25th day of January 1834, the jury found a verdict for the plaintiff for 229,535 dollars 79 cents, upon which a judgment was entered by the court.

Upon this judgment, the plaintiff, on the 6th of June 1834, issued a writ of attachment, under the laws of the state of Delaware, for the collection of part of the amount of the same, and of the costs; which was served on Thomas P. Crowell as the garnishee of the Chesapeake and Delaware Canal Company. The same proceedings took place in the case of Richard Shoemaker.

The defendants respectively appeared, and pleaded that they had

no goods or effects, rights or credits of the company in their hands at the time of the attachments, or at any time after.   The cases came on for trial on these pleas and issues, according to the laws of Dela-. ware ; and the parties agreed to a statement of facts.

In the suit against Thomas P. Crowell, the agreed facts were as follows :

" John Randell, Jun. recovered a verdict of a jury in the said court against the said company, on the 25th day of January 1834, and then and there obtained judgment in the said court against the said company for damages and costs of suit ; amounting together to the sum of 229,535 dollars 79 cents.   The pleadings, record and proceedings in the said suit, from the declaration to the judgment inclusive, are referred to, and form a part of this case.

" A writ of attachment was issued upon said judgment for the collection of the damages and costs aforesaid, on the 6th day of June, A. D. 1834, returnable to the November term of the same year. The said writ was served upon the said Thomas P. Crowell, in the county aforesaid, at the Delaware tide lock, who was summoned by the sheriff of Newcastle county, as garnishee of the Chesapeake and Delaware Canal Company, on the 15th day of June 1834.   At the same time the said Thomas P. Crowell was arrested by virtue of the above mentioned capias, being No. 34 to November term of said court, A. D. 1834, at which time and place the said defendant (the said Thomas P. Crowell, to wit) having appeared and given bail, and being put to plead at the election of the said plaintiff under the said act of assembly, pleaded that he had no goods, chattels, rights, credits or effects of the said the Chesapeake and Delaware Canal Company in his hands, custody or possession at the time of the attachment laid, or at any time after.   On this plea the plaintiff hath joined issue, and this is the question now submitted to the court for their decision.

" On the 28th day of January, A. D. 1834, a resolution was passed by the board of directors of the Chesapeake and Delaware Canal Company, in the following words, that is to say :

" Resolved, That hereafter no tolls be collected on the line of the canal on any vessel, cargo or other article passing through the canal, until the said vessel, cargo or other article on which the said tolls may be levied or charged, shall have entered the basin at the western end of the canal ; excepting only such vessels, cargo or other article as may not pass through the canal to the said basin."

[Crowell v. Randell.  Shoemaker v. Randell.]

" This resolution has never been printed by the said company, nor hath any notice whatever thereof been given to the said John Randell, Jun., until this time. It is admitted that the said resolution was adopted for the purpose of preventing the said John Randell, Jun., from attaching the tolls of the said company by virtue of the said judgment; or otherwise availing himself of the jurisdiction of the courts of the state of Delaware, for the collection of his said judgment.

" The defendant at the time of the service of the said writ of attachment and capias upon him was, hath ever since been, and still continues to be the master of the schooner Hiram; the said schooner being in his hands and possession during that time as the master of the same, and owner of the said schooner. The said vessel passed through the Chesapeake and Delaware canal, with a cargo from Philadelphia to Richmond, on the 16th day of June, A. D. 1834. The amount of tolls on the several cargoes of the said schooner demanded for passage through the said canal between the 16th day of June, and the return day of the said writ, was 96 dollars and 28 cents, lawful money of the United States of America, and was paid in the city of Philadelphia, to S. Griffiths Fisher, an officer appointed by the said president and directors of the said the Chesapeake and Delaware Canal Company, to receive and collect tolls at their office in the city of Philadelphia, by a certain Joseph Hand, the freighter of the said schooner; after service of said attachment and capias, and after the said vessel had passed through the canal as aforesaid, but before the return of the said writs.

" The said attachment and capias were served upon the said defendant in Newcastle county, at the time of his offering to pass through the said canal at the Delaware tide lock, with the said vessel and cargo, and previous to the vessel passing through the same, to wit, on the 15th day of June, A. D. 1834. The said tide lock was, when the said canal was opened for navigation on the 17th of October, A. D. 1829, established by the president and directors of the said company, as a place for the receipt of tolls in the said canal; and a collector of tolls has always been appointed to reside at that place; and a certain John Wilson was, at the time of issuing said attachment, and has ever since been such collector at said tide lock.

" The printed paper hereunto annexed, marked with the letter A,

is a true copy of the regulations to be observed by vessels navigating the Chesapeake and Delaware canal, adopted by the board of directors of the said company, with the rates of toll for navigating the said canal, the same having been signed by the president and secretary of the said company, and published by order of the president and directors thereof; and it is agreed shall be taken as a part of the case : except so far as they had been altered by the resolution of the 28th of January above set forth."

[The material regulations in the paper A, established the 4th of February 1833, were the following :

1. No vessel shall enter the canal without first coming to anchor, or making fast to the piers at least one hundred feet from the outer locks.

2. Masters of vessels shall, before entering the first lock, present to the collector a manifest of cargo, so arranged as to enable him readily to calculate their tolls.   And in order to guard against frauds, the collectors are authorized to require the cargo to be landed for examination, if they shall see cause to suspect the correctness of the manifest.

5. The tolls shall always be paid at the first lock passed by a vessel ; and upon payment thereof, the master shall receive a pass bill, on which shall be noted the amount of tolls paid, and the precise time of entering.

7. If any vessel shall pass through the canal without fully and honestly paying the prescribed tolls, either of the collectors is authorized by law " to seize such vessel, wherever found, and sell the same at auction for ready money ; which, so far as is necessary, shall be applied towards paying said tolls, and all expenses of seizure and sale."   And to enforce the penalties.

21. The officers and agents of the company are fully authorized by law to enforce obedience to the foregoing regulations ; and they are required so to do.

22. No person is allowed to interfere with the agents or officers of the company in the performance of their duties on the canal.   Should reasonable ground of complaint occur against such officers or agents, either by unnecessary delays or improper conduct, it will be immediately redressed, on information being lodged at either of the offices of the company.]

" It is further agreed, that the sloop Robert and James, the defendant being then and there the master, and having the direction

thereof, passed through the Chesapeake and Delaware canal with a cargo from Port Deposit to Philadelphia, on the 18th of June 1834, and three several times afterwards, to wit, on the 26th day of June 1834, on the 16th day of October 1834, and on the 5th day of November 1834, between that day and the return day of the said writ of attachment.   Copies of the pass bills given to the said defendant on these occasions, were annexed.

" The amount of tolls on the several cargoes of the said sloop, demanded for passage through the said canal, by the Chesapeake and Delaware Canal Company, at their lock, at the western end of the canal, in the state of Maryland, and there paid by the said Thomas P. Crowell, master of the said sloop, between the said 18th of June and the return day of said writ, was 74 dollars and 44 cents, lawful money of the United States of America.

" The acts of the legislatures of Delaware, Maryland, and Pennsylvania, relative to the said the Chesapeake and Delaware Canal, and the several supplements thereto are referred to, and made part of this statement of facts.

" It is agreed that in many cases since the resolution of the 28th of January 1834, above set forth, tolls for the passage of vessels and their cargoes through the Chesapeake and Delaware Canal, from the eastern end of said canal, in the state of Delaware, to the western end thereof, in the state of Maryland, were received by some agent appointed by the president and directors of the said company, at their office, in the city of Philadelphia; and were paid by the owners or captains, or by the agents of said owners or captains, to the officers or agents of said president and directors of said company at said office.

" It is further agreed, that independently of the tolls so attached, and all other tolls of the said company attached by the said John Randell, Jun., a sufficient amount of tolls was always left in their hands, not attached, to repair and keep in order the said canal, their locks, and other works necessary thereto, and to keep the same navigable; also to defray the expenses of the collection of tolls, including the salaries of all their officers.

" It is further agreed, that the said canal, the construction of which was commenced on the 15th day of April 1824, was completed and open for navigation on the 17th day of October 1829.

" It also further agreed, that previous to the rendition of the judgment above named, obtained by John Randell, Jun., against the said

canal company, that the tolls were collected in the canal at the respective toll houses located at Delaware city and Chesapeake city, from the captains and masters of vessels passing through the said canal : but the counsel for the said defendant protests that said captains and masters were not personally liable to the said company for the said tolls so paid by them.  If upon the foregoing statement of facts the court shall be of the opinion that John Randell, Jun., the above named plaintiff, is entitled to judgment against the defendant as garnishee of the said the Chesapeake and Delaware Canal Company, upon the plea of nulla bona, then judgment to be rendered for the said plaintiff for the sum of 96 dollars and 28 cents : and if the court should be of the opinion that the said John Randell, Jun., is not entitled to judgment against the said defendant, on the aforesaid statement of facts, the judgment to be entered for the said defendant."

The following extracts from the laws of Maryland and Delaware were made part of the case :

Extract from Delaware law, passed February 1832.

"Be it enacted, that in case any master, shipper or agent shall fraudulently present to the collector of tolls, or other agent of the canal company, a false manifest or account of cargo of any vessel or boat about passing through the canal, or give a false statement of the tolls thereon, or otherwise attempt to defraud in the said tolls, on conviction thereof, before any justice of the peace for Newcastle county, he or they so convicted, after paying to the canal company the toll due, and the cost of ascertaining the same, shall forfeit and pay double the amount of tolls so charged, on which the fraud had been attempted : one moiety of said forfeiture shall inure to the person giving information and prosecuting the offence to conviction, the other moiety to inure to the state of Delaware."

Extract from Maryland law, passed December 1831.

"Be it enacted, &c., that if any master or agent of any vessel or boat shall fraudulently present to the collector of tolls, or any other agent of the Chesapeake and Delaware Canal Company, a false manifest or account of cargo of any vessel or boat about passing through the canal, or give a false statement of the toll thereon, or otherwise attempt to defraud in the said tolls, on conviction thereof before any justice of the peace of this state, he shall incur the penalty of twenty dollars, to be recovered before some justice of the peace as small debts are recovered, one half to the informer giving informa-

tion and prosecuting the offender to conviction, and the other half to the state."

On this agreed statement the case was certified to the court of errors and appeals for argument and decision; and in October 1835 the court decided that the defendant had goods and chattels, effects and credits, &c. of the company in his hands, at the time of the attachment laid in his hands, and before the return thereof, amounting to 95 dollars; and judgment was rendered in favour of the plaintiff.

The record and proceedings were remanded to the superior court of the state of Delaware, and the defendants prosecuted this writ of error.

The case of Richard Shoemaker differs from that of Thomas P. Crowell only in this; that in his case it was necessary for the court to decide, in order to render judgment for the plaintiff, that the voluntary payment of toll by the master of a vessel to a person appointed by the directors of the company to receive said toll in Philadelphia, was, under the facts stated in this case, a fraud on the attachment laws of the state of Delaware, and on the jurisdiction of its courts; and especially fraudulent, and therefore void, as against a judgment creditor of the company seeking satisfaction of his debt in that state, according to the attachment laws thereof: and the court so decided.

Mr Webster and Mr Clayton moved to dismiss the cases for want of jurisdiction.

Mr Webster :

The whole case appears on the record; and the court, on inspecting it, will find there is nothing which can give jurisdiction. The proceeding of the plaintiff was an attachment to recover the amount of a judgment, or such part of the same as was in the hands of the defendant in the attachment; who was a debtor to the Chesapeake and Delaware Canal Company for tolls, to which his vessel and cargo were subjected, according to the charter of the company, for passing through the canal. The judgment obtained by the defendant in error was in a case in which no constitutional question arose; nor was the construction of any treaty or law of the United States involved. It was simply a proceeding on a contract, which the

[Crowell v. Randell.    Shoemaker v. Randell.]

plaintiff alleged the defendants had violated ; and in which the jury gave him a verdict for a large sum as damages.

Nor do the agreed facts give jurisdiction. On them no question is presented upon which the court can decide. The matter in the statement is such as the courts of the state of Delaware had full cognizance of ; and in the proceedings of the courts of Delaware on those facts, no question was raised which can come under the revision of this court.

In the early cases, it seems to have been expressly required, that the law of the United States, or the state law, or a treaty which was asserted to be misconstrued, should be expressly stated ; and unless it appeared to have been fully and expressly stated what law of the United States, or of the state, or constitutional provision had been violated, this court would not take jurisdiction.

This has been relaxed, and jurisdiction has been sustained, where it appeared on the face of the record that the court to which the writ of error was directed could not have given judgment without having misconstrued the law. Craig v. The State of Missouri, 4 Peters 410.

In the attachment suit, there was a plea of "nulla bona ;" and on this issue it is not seen how a question arose which could give this court the revisory power sought in the case. The defendants had no visible property to satisfy the judgment of Mr Randell ; and he proceeded by an attachment of the tolls payable to the company, according to the fixed regulations established by them, and in full force at the time of the proceeding. The courts of Delaware thought the removal of the collection of the canal tolls to Philadelphia, was was a fraud on Mr Randell ; that the canal tolls were, by the charter payable, and should be paid on the canal. The question was, whether the tolls were so payable ; and the courts of Delaware so decided. The twenty-fifth section of the judiciary act requires that the point which this court may decide, on a writ of error to a state court, shall be settled precisely by the court. It is important that it shall appear what is decided. On the record in this case, this cannot be done. The judgment of the court of Delaware on the question, whether the garnishee had or had not goods in his hands belonging to the Chesapeake and Delaware Canal Company, could be decided without affecting, and would not necessarily involve the decision of a constitutional question. Cited the attachment laws of Delaware.

The judicature of Delaware is of the highest respectability, and

[Crowell v. Randell.    Shoemaker v. Randell.]

it has no disposition to evade the provisions of the constitution; or to claim jurisdiction which it has not. The defendant in error, to obtain satisfaction of a judgment now exceeding 250,000 dollars, has been obliged to resort to the courts of Delaware; and to institute a number of suits, by attachment, for sums which do not exceed or amount to 100 dollars. The courts of Delaware considered him entitled to relief under the laws of the state; and did not consider the question as one which was to be affected by any other than those laws.

Mr Sergeant, for the plaintiff in error.

A great many questions and interests are involved in this case: but the single point now before the court, or which can now be considered, is, whether there is so much shown in the record, as to give this court jurisdiction to examine and revise the judgment of the court of Delaware. We are not now to discuss whether the laws of Delaware are inconsistent with the constitution and laws of the United States; and to have the same now decided. We now maintain the plaintiffs have a right to be heard on this question, when the case comes on regularly for argument; and this will be shown.

The plaintiffs in error present the question, whether the acts of the legislature of Delaware, and the application of those acts, were inconsistent with the rights which the Chesapeake and Delaware Canal Company acquired under the charters of Pennsylvania, Delaware and Maryland. If they were, the plaintiff below was entitled to judgment; but if not, then the judgment violated the constitution of the United States. Whether the acts of the assembly of Delaware, under which the plaintiff below proceeded, were valid or invalid, decides the question in the case.

It is admitted that the plaintiff in error is bound to sustain the jurisdiction of the court. The court will find the whole case in the agreed statement; and both cases are alike, except that in Shoemaker's case the tolls were paid in Philadelphia before the attachment was laid on him as the garnishee of the company.

Is there any question presented by the record of which this court has cognizance?

The allegation is, that the laws of the state of Delaware, as applied to this corporation, are repugnant to the charter, and therefore violate the charter; and are thus contrary to the constitution of the United States, art. 1, sect. 10, 1. What the laws of the state of Delaware

are, must be known by the decisions of the courts of that state.  The construction given to them by those courts is here to be assumed to be right ; and the same is not to be brought in question.  It is not the subject of re-examination in this court, and is to be taken as final and conclusive.

The question then is, whether the laws, thus construed, are not unconstitutional and void; so far as they apply to the corporation of the Chesapeake and Delaware Canal Company, and to persons using the canal ?

It is not meant, or intended to be said, generally, that they are unconstitutional : a law may be good in part, and bad in part : it may be good as applied to one person, and bad as applied to another.

It is maintained that it does sufficiently appear in the record that the law of Delaware is unconstitutional, and void, as to those parties.

It need not appear that the question was made in the state court. It need not be stated in the record that the constitutionality of the law of a state came in question.  It is not required that in the court below the question was considered.  All that is requisite is, that such a question was applicable to the case.  Martin v. Hunter's Lessee, 1 Wheat. 304 ; Inglee v. Coolidge, 2 Wheat 363 ; Miller v. Nichols, 4 Wheat. 311 ; Lanuse v. Barker, 3 Wheat. 101 ; Wilson v. The Blackbird Creek Marsh Association, 2 Peters 245 ; Satterlee v. Mathewson, 2 Peters 409 ; Harris v. Dennie, 3 Peters 392; Davis v. Packard, 6 Peters 41 ; Williams v. Norris, 12 Wheat. 117, 2 Peters's Cond. Rep. 325.

Are the laws under which the plaintiff in the Delaware court proceeded, inconsistent with the charter of the company, and thus unconstitutional ?

The fourth section of the act of February 10th 1829, provides that " an attachment may be laid on tolls due, and to become due;" and that the proceedings may be the same as in other cases of attachment.

What are the proceedings " in other cases of attachment ?"  They will be seen by a reference to the act of the legislature of Delaware, of the 24th of March 1770 ; Laws of Delaware 462 ; and particularly by a reference to the third, sixth and seventh sections; the last particularly.

The third section authorizes the attachment of the effects of an absent debtor, and allows the sheriff to take possession of them in the hands of any one with whom they may be found, unless security is

[Crowell v. Randell. Shoemaker v. Randell.]

given for them: which security will be liable for the amount, unless the debtor in the attachment puts in special bail to appear to the suit, and abide by its result. The sixth section directs the proceedings against the garnishee, who may, through the verdict of a jury, be made liable for all the effects of the defendant in his hands at the time of the attachment, and up to the time of judgment. The seventh section, on an affidavit that the garnishee has effects of the debtor in his hands, and is about to depart; authorizes a capias against him, on which he is to give sureties to appear, make answer, and abide the judgment of the court.

The effect of these sections is, to deprive the company of all right to collect the tolls of the canal; and to put into the power of any creditor to appropriate them to his own use, and to the satisfaction of a debt due to him. Thus the whole of the rights of the company to tolls are suspended; and the contract formed between the state of Delaware and the company by the charter, is defeated and annulled. The attachment law then, as applied to the case before this court, violates the compact between the states of Maryland, Pennsylvania, and Delaware, and with all the corporations, and with the citizens of the United States.

Maryland owns 50,000 dollars of stock in the company : Pennsylvania 100,000 dollars : and the United States own 450,000 dollars.

That this is true, that the contract of the charter is thus violated, is shown by the following examination of the charter :

1. By the ninth section of the act of Maryland of the 7th of December 1799, the company have a right to demand and receive the tolls at such places, on the canal, as they may direct. The ninth section of the act of Delaware of the 29th of January 1801, and the act of Pennsylvania of the 19th of February 1801, adopt the law of Maryland ; and certain stipulations are made for Maryland.

The attachment law of Delaware, as it has been applied in this case, is in direct contravention of these positive stipulations. The company, by the application of the attachment law to the tolls; are not permitted to demand and receive the tolls. They are demanded and received by another. This is a plain violation of the contract.

2. By the eleventh section of the charter of Maryland, and the tenth section of the charter of Delaware, the canal is declared a public highway on payment of tolls as fixed and regulated. It is of course free to every citizen of the United States coming to the canal, and paying the collector at a place on the canal.

By the application of the attachment laws to this case, such a person cannot pass.    1. He is not allowed to pay the collector and go on.    2. He cannot pass toll free, if the company are willing he may do so.    3. He cannot pass although he has actually paid the company.    He is liable to suit; and he is liable to arrest.

Mr Clayton, in support of the motion.

The court of Delaware decided this cause on the ground of fraud on the laws and the rights of the defendant in error.    No question worthy of the *name* of a question of constitutional law, was, or could have been presented to that court.

It has been laid down by this court, (*a*) that " every creditor must be presumed to understand the nature and incidents of a corporation, and to contract with reference to them ;" and it is a settled principle, that when the charter or act of incorporation prescribes the mode in which the officers or agents of a corporation must act or contract, to render their acts or contracts obligatory on the corporation ; that mode must be strictly pursued.    For the act of incorporation is an *enabling* act : it gives the corporate body all the power it possesses : it enables it to contract ; and when it *prescribes* the mode of contracting, that mode must be observed, or the instrument no more creates a contract, than if the body had never been incorporated.(*b*)    Lord Eldon has said, " it is necessary to confine the powers given to *canal companies*, strictly within the limits of such powers."(*c*)    And the the principle, as applicable to all corporations, has been stated by this court.(*d*)    It is believed that this rule has been adopted in every state in the union.(*e*)

Randell, as a contractor with this canal company, dealt with it on the faith of its charter.    According to the rule laid down by this court,(*f*) he must be presumed to have " contracted with reference to its incidents."    By the third section of the charter, it is expressly provided, that a contractor shall be paid out of the tolls imposed by

(*a*)  Mumma v. The Potomac Company, 8 Peters 287.

(*b*)  Head and Amory v. The Providence Insurance Company, 2 Cranch's Rep. 166; Shand v. Henderson, 2 Dow 521.

(*c*)  The same rule was laid down in Goldin v. Oswald, 2 Dow 534, 535.

(*d*)  Beatty v. The Lessee of Knowler, 4 Peters 168.

(*e*)  The case of the Utica Insurance Company, 15 Johns. Rep. 381 ; 2 Cowen 419 664 ; 7 Cowen 462 ; 6 Pick. 32 ; 5 Conn. Rep. 560 ; 8 Serg. & Rawle 222 ; 14 Mass. Rep. 58 ; 17 Mass. Rep. 29

(*f*)  8 Peters 287.

the act; and the eighth section of the charter prescribes the places for collecting tolls, to be "such place or places, *in the canal*, as the directors may hereafter direct."

By the regulations and by-laws, annexed to the statement of these cases, it appears that such places were directed and established: to wit, "the toll shall always be paid at the first lock passed by a vessel," and the collectors of tolls are "required to enforce" this rule. The Delaware tide lock was one of those places thus established at the time of these attachments. Randell now only claims that the company, and all other persons dealing with it, shall be held to the law of the charter, and that no person having direction of a vessel, may be suffered to pass toll free or without paying toll *in the canal*. But the directors of this company have collected toll *in Philadelphia*, and not in the canal. By these means, if lawful, the payment of his judgment will be completely defeated. For if it be lawful to collect tolls *out of the canal*, they may as well collect them in New Jersey, as in Pennsylvania; and may remove all the toll-houses out of any state jurisdiction, long before he can obtain a judgment and process within it. They can thus defeat any creditor. This salutary provision in the charter was made for the very purpose of retaining some jurisdiction over this company, to compel payment of its debts and enforce a compliance with its obligations; and if it had been omitted, the company could have been reached by no other state or power. It is but an affirmance too of the old common law principle, that "toll bars cannot be erected out of the place for which toll is demanded."(a)

If this company can thus collect tolls out of the states which chartered it, it can defeat the payment of the bonus reserved by Maryland, which is a share of the net profits on the tolls. Delaware has, by a subsequent act, repealed the section which reserved a share of the tolls for her benefit; but she has substituted a provision in lieu of i' for the benefit of the public, viz. "that whenever and so long as the ne profits arising from the said tolls, shall amount to fifteen per centum per annum; the company shall *lessen* the rates of toll fixed by the said act, so that the same shall not exceed twelve per centum per annum." The public is thus interested in the faithful collection of the tolls, according to the charter. But if toll be collected in Philadelphia, a vessel may take in a new cargo before she arrives at the tide lock in the canal, and pass toll free with it.

(a) 6 Comyn's Digest 362, Toll, E; Bunbury 64.

[Crowell v. Randell. Shoemaker v. Randell.]

The rights of the public are also encroached upon by this illegal mode of collecting tolls, in another most important particular. The charter provides for the perpetual maintenance and preservation of the canal as a highway; and directs the tolls to be applied to that object. Any change in the plan of taking toll, may encroach on this public right. The principle of the decision in the case of Lees v. The Manchester and Ashton Canal Company, 11 East 656, is full on the very point. Lord Ellenborough there says, "the public have an interest that the canal shall be kept up; and whatever *has a tendency* to bring it into hazard, is an encroachment upon their rights in it. They have also an interest that the tolls shall be equal upon all; for if *any* are favoured, the inducement to the company to reduce the tolls generally, below the statute rate, is diminished." Hence, in that case, the court decided that a contract to pay toll in any other way than according to the charter, was *absolutely void*.

In the charter of this canal company, there is power given to reduce the tolls below the statute rate, by the proviso to the ninth section. Apply this doctrine first to Crowell's case. He paid no toll when he passed the canal with his vessel; nor was any paid till months after. He passed toll free. It was a fraud on public rights, as well as the private rights of Randell. Then apply the same principle to Shoemaker's case. He paid *in Philadelphia* before he went through the canal. He might have taken in a new cargo of ten times the amount of that on which he paid toll, any where between Philadelphia and the Delaware tide lock in the canal, which are nearly fifty miles apart; and by this arrangement, it would have passed toll free. For that very reason therefore, that his payment of toll in Philadelphia *might* affect other interests, his payment was a nullity. It was a voluntary payment to a void authority; in fraud of the rights of the attaching creditor, and of the rights of the public. As a fraud, the court below regarded it, and held it as against the creditor *absolutely void*.

And even against the stockholders themselves, the payment ought to have been adjudged void if that case had arisen. It was made by order of the *directors* only, and they are but agents of the corporation, who have clearly no power to bind their principal beyond the authority limited by the act of incorporation. (*a*) Any one stock-

(*a*) Fleckner v. The United States Bank, 8 Wheat. 356, 357; 17 *Mass.* Rep. 29, 30; 1 Greenleaf's Rep. 81.

[Crowell v. Randell. Shoemaker v. Randell.]

holder had a right to treat the payment in Philadelphia as a legal fraud, in plain violation of his vested rights under the charter. But this was not the case presented. It was the case of a *creditor*, as to whom, *a fortiori*, there can be no pretence that the payment was binding.

There is also a clause in the charter which provides, that " the same *rate* of tolls shall be paid on articles passing from Chesapeake to Delaware, as upon those paid from Delaware to Chesapeake." Sect. 9. This clause is violated in Crowell's case, and also in Shoemaker's. In Crowell's case no toll was paid at either end of the canal at the time of passing, but an indulgence of some months was granted before any payment: while other persons paid at or before the time of passing, and while there was a standing by-law directing all to pay *in the canal.* The amount of his tolls from Chesapeake to Delaware, was really less than the amount paid by him from Delaware to Chesapeake, as the case shows. The value of the indulgence in the former case, therefore, was greater than in the latter. In this way the company may establish what would be equivalent to a discriminating duty in favour of the commerce of Philadelphia, and cut up the commerce of Baltimore : the very thing which the charter intended to prohibit. They may thus agree with every man passing from Philadelphia to wait for the toll; while they rigorously enforce payment on all coming from Baltimore. They may grant this indulgence only to those who trade from the favoured city.

If it be pretended that they have the power to do this under the general authority given them to lessen the tolls; the answer is, first, this authority can be exercised only by the stockholders at a general meeting, at which *proprietors* having five hundred shares of stock must be present; whereas, in this case, the *directors* alone have reduced the toll: and, secondly, the power given to the company to lessen the tolls, is not a power to reduce tolls at one gate or lock, and not at the other. It has been decided, in a similar case, that tolls cannot be reduced at one toll gate and not at the other. (a)

This company has no power to *commute* with any person for tolls. That power can never be exercised unless expressly conferred. It is a power often to be found in the common turnpike acts passed by the states, but not in any canal act which is known. The reason for this will be found in the jealousy with which the legislatures

(a) In The King v. Bury, 4 Barnewall & Cresswell 361.

[Crowell v. Randell.  Shoemaker v. Randell.]

regard all power to give commercial advantages to one port or place over another.  Yet the contract to receive toll in Philadelphia, is really a *commutation* for toll; and if sustained, there is no limit to its exercise.  The principle of commutation may at once destroy the equality of rates paid by vessels passing from the different bays, and violate that part of the charter.  It is a fraud on the commercial interest of those waters against which the discrimination is made.

The payment of toll in Philadelphia is a fraud on the attachment laws, both of Delaware and Maryland.  The attachment law of Delaware, under which the defendant in error claims redress; was passed sixty-six years ago; was in force at the time of the grant of this company's charter; and its constitutionality has never been questioned.  It is very similar to the attachment law of Pennsylvania; and is, in some respects, like the acts in New England, against trustees of absconding debtors.  It was, I apprehend, never doubted or denied in Delaware, that it applied to the debtors of all corporations; and under *this* act the court below could have decided.  Another act was passed in 1829, before this canal was opened for navigation, making the "tolls due, and to become due," on this canal, liable to attachment; but the court below, as the opinion is understood, expressly declared, in giving judgment on these cases, that this act was *declaratory* and gave no new power.

Any and every contract in fraud or in contravention of law is void;(*a*) and so are all contracts which *tend to prevent the due course of justice.*(*b*)  The payment in Philadelphia, by Shoemaker, was a payment in fraud of the law; and falls precisely within the rule adopted in England in regard to all contracts executed or executory, which are in fraud or contravention of the revenue laws.  Smuggling itself cannot be regarded as more odious than the passage of a vessel through a canal toll free, under a trick to defraud a creditor; and to evade the only laws provided for his security by any states in the union.

It must be manifest that, if these attachment laws cannot be enforced on the ground of unconstitutionality, chancery has no power in any state to grant relief.  The chancellor of Maryland has lately decided that he has power to appoint a receiver, to enable him to pay debts; and the subject is now before the chancellor of Delaware too.

(*a*)   3 Term Rep. 454; Dallas 334, 335, 336; 7 Angel & Ames 142.
(*b*)   Comyn on Contracts 44.

[Crowell v. Randell.   Shoemaker v. Randell.]

If a valid payment of toll can be made in Philadelphia, to evade the attachment law ; that payment would be equally valid as against a receiver appointed by the court of chancery.   If the attachment law be held unconstitutional, on account of such a previous payment ; surely there is no redress in equity against it, and the result is inevitable, that this corporation is *above the law.*

The payment of toll in Philadelphia is a manifest violation of the by-laws of the company.   The fifth regulation to be observed by vessels, is: "The tolls shall *always* be paid AT THE FIRST LOCK passed by a vessel ; and upon payment thereof, the master shall receive a pass bill, on which shall be noted the amount of tolls paid, and the precise time of entering."   The twenty-first regulation directs as follows : "the officers and agents of the company are fully authorized by law to enforce obedience to the foregoing regulations ; and they are *required* so to do."   These by-laws were made in pursuance of an act of the legislature, supplementary to the charter ; which provides that the by-laws shall not be in contravention of the existing laws of the land.   That act was passed in 1832, long after all the attachment laws were in force.

Randell therefore is protected not only by the general law of the land, but by the very by-laws of this corporation, against payments in Philadelphia ; and it is insisted that the plaintiff in error is bound by the established rule, that "the restrictions upon the power of the agents or officers of a corporation, contained in the act of incorporation, *every person dealing* with the company is bound to notice. (*a*)

No by-law could be made to appoint an officer to collect tolls in Philadelphia.   Such a by-law would not only have been in contravention of the attachment laws of the state, but of the charter itself. A by-law may regulate, but cannot *alter* the constitution of a corporation. (*b*)   A by-law cannot take away a right, or impose any unwarrantable restraint on the exercise of it ; (*c*) and a by-law must be reasonable.   But a regulation to direct the payment of toll in Philadelphia, would be unreasonable and unjust ; as it would compel every trader south of the canal to go out of his way to Philadelphia, a distance of nearly fifty miles, to pay toll.   It would operate as inju-

(*a*) Angel & Ames 172 ; Wyman v. Hallowell and Augusta Bank, 14 Mass. Rep. 58 ; Salem Bank v. Gloucester Bank, 17 Mass. Rep. 29 ; Wild v. Passamaquoddy Bank, 3 Mason's Rep. 506.
(*b*) 1 Kyd 113.
(*c*) 1 Kyd 122.

riously as a discriminating duty against the commerce of Baltimore; and would be in direct contravention of the spirit of the proviso to the ninth section of the charter, "that the same rate of tolls shall be paid on articles passing from Chesapeake to Delaware, as upon those paid from Delaware to Chesapeake." It would impose on the trader a burthen so onerous, as to amount to a new toll or tax, not imposed by the charter; in contravention of the tenth section also.

The act of 1832, which is a supplement to the charter and forms part of it, is the authority for these by-laws: and, as stated, it expressly provides that they shall not be made "in contravention of the constitution or laws of the state." A by-law directing payment elsewhere than in the canal, would not only be in contravention of the laws of the state, but void as tending to prevent the due course of justice.

The liability of the person having direction of a vessel which has passed the canal without payment of toll, is fixed by the ninth section of the original act of incorporation; which, after it provides that "if any vessel shall pass without paying the said toll, then said collectors *may* (it is not said *shall*) seize such vessel wherever found, and sell the same at auction for ready money; which, so far as is necessary, shall be applied towards paying said toll, and all expenses of seizure and sale, and the balance, if any, shall be paid to the owner"' then also expressly enacts, that "the person having the direction of such vessel, *shall* be liable for such toll, if the same is not paid by the sale of such vessel as aforesaid." It is clear that the object was, as the language expresses, that the master should be liable in all cases where the toll is not paid by the sale of the vessel. If the company decline to sell, which they *may* or *may not* do at their pleasure, in case the vessel pass without payment of toll in the canal, surely the liability of the master of the vessel is fixed. It is in vain to contend that the sale is an essential pre-requisite to this liability. Such a construction would enable the master to take advantage of his own wrong, and would be an absolute premium for his own fraud: for then if he could escape toll free out of the jurisdiction of the state, with his vessel, he would not be liable. Such a construction renders the master's exemption from liability dependent on the success of his own fraud; and furnishes an inducement to him to commit barratry, by exposing the vessel to loss by seizure and sale. Our construction is, that the remedy against him is cumulative to the right of seizure and sale of the vessel: and were this not the true construction of the charter, of which we think there can be no doubt;

yet by the common law a master is regarded as the ship's husband; and is liable for pilotage, port dues, tolls and all the expenses necessarily incident to the voyage. This common law remedy is cumulative to that provided by the statute.(a)

It remains for the court to say, with this view of the case, whether there was really any constitutional question necessarily arising on this record. Can a sensible man ; could a sensible court find any such question here, which was decided against the plaintiffs in error? Their counsel alleges that such a question necessarily arises under the provisions of these charters, which he regards as " *a compact or agreement*" between the states of Pennsylvania, Delaware and Maryland. But how is it pretended that the compact has been violated? Did Delaware ever enter into any compact or agreement that any man should pass the canal toll free, or on payment of toll *in Philadelphia ?* Or did she ever agree that any man should pass the canal through her borders, without being liable to that attachment law which was passed by her in 1770; and was in full force when the charter of this company was granted? That act authorizes any plaintiff in a judgment to attach the goods, chattels, rights, credits, or effects of any defendant whatsoever; and compels the debtor or garnishee to answer how much he had in his hands, custody or possession belonging to the defendant at the time of the attachment laid, or at any time after and before the return of the writ. It was thought by the court below, and must by this court be seen to be sufficient for the plaintiff's purposes, even if the special act of 1829, which expressly authorizes the attachment of the tolls of this very corporation, had never passed. Under that act of 1770 alone, the court of Delaware, it will be perceived, could not have had the slightest difficulty in passing judgment as they did. They must have considered the act of 1829 as merely declaring and confirming a pre-existing right in every creditor, derived from a law which was in full force thirty years before the state chartered this company. The question, therefore, which it is pretended was raised in the state court, was, whether an act in force at the time of the charter, granting a remedy to a creditor, is constitutional? *Is* that a question ? Is it really *questionable,* whether those who take a charter under a state, thereby subject themselves to the laws of the land existing at the time, which provide remedies for the administration of justice ?

(n) Sharp and another v. Warren, 6 Price's Reports 131.

The counsel for the plaintiffs in error may, it is true, put this as a question: but every *interrogatory* which counsel can put is not a *question* within the meaning of the twenty-fifth section of the judiciary act.

It is believed that a glance at the case will satisfy the court, that there could not possibly have been a real *question* as to the violation of any compact or agreement by Delaware with any other state. But it would not avail the plaintiffs in error if there had been. The tenth section of the first article of the constitution provides, that "no state shall, without the consent of congress, enter into any agreement or compact with another state." The judiciary act does not authorize this court to revise a judgment rendered in favour of the defendant in error; even if a constitutional question could have arisen on this clause, which I do not admit. To give this court jurisdiction, the decision in the state court must be *against* the title, right, privilege or exemption specially set up by either party under the constitution.

The act of 1832, which is a supplement to the charter, provides that a master of a vessel, who shall in any manner whatsoever attempt to defraud in the matter of the tolls, shall not only pay the tolls, but a forfeiture besides. Can it be made a *question* whether this liability of the master did constitutionally exist in these cases? If not, can it then be made a *question* whether the attachment law, which reaches that liability, is constitutional? By the charter the company is authorized to sue and made liable " to be sued." This process of foreign attachment is a mode by which it has been sued: and to set up the principle, by sustaining jurisdiction in this case, that a question arising under the constitution is presented by the fact stated, that this company has been thus sued; is to establish the doctrine that every decision in a suit against a corporation in the states is liable to be reviewed in this court. In Bushel v. The Commonwealth Insurance Company, 15 Serg. & Rawle 176, the supreme court of Pennsylvania decided that the debts due to a *foreign corporation* were liable to be attached for the payment of a claim against the corporation: and whatever doubts may be entertained as to the *application* of their attachment laws, which are similar to those of Delaware, to the cases of foreign corporations; no one ever denied or doubted the constitutionality of those laws as thus construed and applied. Yet while *they* claim a constitutional jurisdiction over all the corporations in the world, so far as regards the debtors of those corpo-

rations found within their limits; the objection comes from that state against the constitutionality of the jurisdiction of Delaware over her own domestic corporation; a corporation to which she gave leave to be, and which without her assent could never have existed: a corporation more than three-fourths of whose canal lies within her acknowledged limits; and which is at once above the law, and not liable for its debts, if she cannot and does not compel obedience to her laws.

As to the resolution mentioned in the cases stated, passed three days *after* the original judgment of the plaintiff below against the canal company, and which directs tolls to be collected *in Maryland*; it was manifestly a meditated fraud. Any other by-law passed to evade the jurisdiction of Delaware would be equally a fraud on the law. Even were such a by-law held good, however; it would not prevent the courts of Delaware from compelling payment to the company's creditors claiming strict justice at her hands. Her attachment, laid in the hands of a master of a vessel, is a discharge from all tolls due or to become due from him at and after the service of the writ, and until the return of it. A Maryland attachment furnishes a good defence for a garnishee in New York; and a Delaware attachment is an equally good defence for a garnishee in Maryland. He who passes the Maryland lock in the canal after being served with a Delaware attachment, and before its return; is protected by the writ, according to the course of all the decisions regulating the law of judicial transfer in this country. The writ protects the captain as a payment in the canal, in the eye of the law; and were any other construction adopted, neither Maryland nor Delaware could give redress to any creditor of this canal company: because, as soon as a judgment could be recovered in one of those states, the company might thus defeat its jurisdiction by removing all the toll houses into the other.

The doctrine laid down in Miller v. Nicholls, 4 Wheat. Rep. 311, 315, that "it would have been sufficient to give this court jurisdiction of the cause, if the record should show that an act of congress was *applicable* to the case;" is inaccurate as understood by the other side. It must appear from the record, that some act of congress, treaty, or clause in the constitution, relied on to give jurisdiction, was not merely applicable, but necessarily applied: and that the court below could not have decided as they did without considering and deciding on it. Such we apprehend to be the true doctrine, as gathered from all the cases.

Mr Sergeant, in reply to Mr Clayton's argument, as introducing new matter.

The concluding counsel for the defendant in error has said, that the case was decided in Delaware in his favour, on the ground of fraud. This is not apparent on the facts agreed upon. Nothing of an allegation of fraud can be deduced from those facts.

What is the fact from the evidence? It is said, that the resolution of the board of directors to remove the collection of tolls out of Delaware was a fraud on the creditors of the company; and on the rights of those who were in any manner connected with the use of the canal. This argument proceeds on the thing to be proved. Suppose the law under which the attachment was laid was unconstitutional, and the question is, whether it is a fraud to violate a law which is unconstitutional—the proceedings under such a law are void acts, and no fraud can be alleged out of such a case.

The argument of the counsel for the defendant in error involves the question which is presented by the record; that the attachment law of Delaware, as it interferes with the rights of the company, is unconstitutional. This is affirming the jurisdiction of this court in the case.

Another view of the matter. How does it appear that this is a fraud on the part of the company, and that they have exposed themselves to the charge of a fraud on the state of Delaware? The charter gives the company the right to demand the toll on the canal; but the place for its payment depends upon the resolution of the directors.

The power to enforce the payment of tolls is made, by the construction given by the counsel for the defendant, applicable to the power to demand tolls on the canal; and it is said that although a person may have willingly paid the toll before he entered the canal, this shall not be done because of the authority given to demand the payment after the vessel has entered it. This construction of the charter is denied. The voluntary payment of the tolls to the company, or to its agents, any where, supersedes the necessity of any demand; and the provision of the charter on which the defendant relies, has no application to such a case. Had the company demanded the toll before the vessel entered the canal, and had this demand, made in Philadelphia, been followed by measures to compel its payment; the case might be, although it is not admitted that it would be different. It is apparent, then, that on the constitutional

validity of the attachment law, thus applied ; the judgment of the court of Delaware depends.

There is no application to this case of the decisions of the courts of Pennsylvania, that a foreign corporation is liable to attachment. The case here, is, where the law of the state makes its own corporation so liable.

This court will not readily entertain a motion to dismiss a case for want of jurisdiction, preliminary to a full hearing of it : for if it shall, on the full examination of it, and after full argument, be found that the court has no jurisdiction, the court will act accordingly. But if without such a hearing the dismission is made, the party may sustain much injury, without any remedy or relief.

The case of Miller v. Nichols fully maintains the objection made to the dismission of this case. The court there decided, that it is sufficient to give it jurisdiction, if it appeared that an act of congress was applicable to the case.

Mr Justice Story delivered the opinion of the Court.

This is a writ of error to the superior court of the state of Delaware, to revise the judgment of the court of errors and appeals of the said state ; the record of which judgment had been remanded to the superior court of the same state.

A motion has been made to dismiss the suit for want of jurisdiction ; upon the ground that there is nothing apparent upon the record to bring the case within the revising power of this court under the twenty-fifth section of the judiciary act of 1789, ch. 20.  That section confers appellate jurisdiction in this court from final judgments and decrees in any suit in the highest court of law or equity of a state in which a decision in the suit could be had in three classes of cases : first, where is drawn in question the validity of a treaty or statute of, or an authority exercised under the United States, and the decision is against their validity : secondly, where is drawn in question the validity of a statute of, or an authority exercised under any state, on the ground of their being repugnant to the constitution, treaties or laws of the United States, and the decision is in favour of such their validity : thirdly, where is drawn in question the construction of any clause of the constitution, or of a treaty or statute of, or commission held under the United States, and the decision is against the title, right, privilege or exemption specially set up or claimed by either party, under such clause of the said constitution, treaty, statute

or commission.   The section then goes on to provide that no other error shall be assigned or regarded as a ground of reversal in any such case as aforesaid, than such as appears upon the face of the record ; and immediately respects the beforementioned questions of validity or construction of the said constitution, treaties, statutes, commissions or authorities in dispute.

In the interpretation of this section of the act of 1789, it has been uniformly held, that to give this court appellate jurisdiction two things should have occurred and be apparent in the record : first, that some one of the questions stated in the section did arise in the court below ; and secondly, that a decision was actually made thereon by the same court, in the manner required by the section. If both of these do not appear on the record, the appellate jurisdiction fails.   It is not sufficient to show that such a question might have occurred, or such a decision might have been made in the court below.   It must be demonstrable that they did exist, and were made. The principal, perhaps the only important difficulty which has ever been felt by the court ; has been in ascertaining in particular cases whether these matters (the question and decision) were apparent on the record.   And here the doctrine of the court has been, that it is not indispensable that it should appear on the record, in totidem verbis, or by direct and positive statement, that the question was made and the decision given by the court below on the very point ; but that it is sufficient, if it is clear, from the facts stated, by just and necessary inference, that the question was made, and that the court below must, in order to have arrived at the judgment pronounced by it, have come to the very decision of that question as indispensable to that judgment.

Although this has been the course of the decisions in this court, as to the extent and exercise of its appellate jurisdiction over the judgments and decrees of state courts ; yet it is apparent from the arguments on the present occasion, as well as from those which have been addressed to us on several other late occasions, that a different impression exists at the bar; and that it has been supposed that a much wider latitude of interpretation of the twenty-fifth section of the judiciary act of 1789 has been adopted by the court.   To correct, at least as far as in us lies, this mistaken notion ; we shall now proceed to review the various decisions which have heretofore been made on this subject.

The earliest case is Owings v. Norwood's Lessee, 5 Cranch 344.

In that case it clearly appeared, that the construction of a treaty was before the state court; and that it was decided that the right of the party was not protected by the treaty. This court affirmed the decision of the state court. The next case was Smith v. The State of Maryland, 6 Cranch. Rep. 281. In that case it was contended that the court had no jurisdiction, because the cause turned exclusively upon the confiscation laws of Maryland; and that no question relative to the construction of the treaty of peace, did or could occur. But upon the facts stated on the record, the only title asserted by the original plaintiffs was founded on the confiscation acts of Maryland; and the only title set up by the original defendant was for a British alien, protected by the treaty of peace. If that title was so protected, then the plaintiffs were not entitled to the relief sought by the bill; if otherwise, then the plaintiffs were entitled to a decree. The state court decided that the plaintiffs were so entitled; and therefore necessarily decided against the treaty as a protection. The jurisdiction was maintained by this court upon this posture of the facts; and the decision of the state court was afterwards affirmed. But the court said, that in order to decide upon the main question, it was indispensable to ascertain what the nature of the title was, to which the treaty was sought to be applied.

The next case was Martin v. Hunter's Lessee, 1 Wheaton's Rep. 305, 355. There the original case came before the court upon an agreed statement of facts, upon which the state court gave judgment against the original defendant. That judgment was upon a writ of error reversed by this court; and when the cause came afterwards before this court upon a second writ of error, the objection was taken that the original case was not within the twenty-fifth section of the judiciary act. Upon this occasion, the court, after stating the material facts in the agreed case, said: "it is apparent, from this summary explanation, that the title thus set up by the plaintiff, might be open to other objections; but the title of the defendant in error [against which the state court had decided] was perfect and complete, if it was protected by the treaty of 1783. If, therefore, this court had authority to examine into the whole record, and to decide upon the legal validity of the title of the defendant, as well as its application to the treaty of peace; it would be a case within the express purview of the twenty-fifth section of the act: for there was nothing in the record upon which the court below could have decided but upon the title, as connected with the treaty. And if the

title was otherwise good, its sufficiency must have depended altogether upon its protection under the treaty. Under such circumstances it was strictly a suit, where was drawn in question the construction of a treaty, and the decision was against the title specially set up or claimed by the defendants. It would then fall within the very terms of the act."

The next case was Inglee v. Coolidge, 2 Wheat. 363, 4 Cond. Rep. 155, where a motion was made to dismiss the writ of error upon the ground, that there was nothing apparent upon the record, which brought the case within the appellate jurisdiction of this court, under the twenty-fifth section of the act of 1789. The court were of this opinion, and accordingly dismissed the writ of error.

The next case was Miller v. Nicholls, 4 Wheat. 311, 315, 4 Cond. Rep. 465. Mr Chief Justice Marshall, in delivering the opinion, of the court, said : "it does not appear from the record, that either the constitutionality of the law of Pennsylvania, or any act of congress was drawn in question. It would not be required that the record should, in terms, state a misconstruction of an act of congress, or that an act of congress was drawn in question. It would have been sufficient to give this court jurisdiction of the cause, that the record should show that an act of congress was applicable to the case. This is not shown by the record." The language used in this last sentence, has been often cited : as if it imported, that if an act of congress was shown to be applicable to the case, although it was not in fact applied by the decision of the state court, it would sustain the appellate jurisdiction of this court. That was certainly not the understanding of the chief justice, or of the court. The case of Miller v. Nicholls was decided in the state court, upon an agreed statement of facts ; by which it appeared that Nicholls was a debtor both to the United States and to the state of Pennsylvania ; and the question raised was, whether the United States, or the state of Pennsylvania, was entitled to certain money of Nicholls, then in court, as the creditor of Nicholls. The United States claimed it in virtue of the priority given by the act of the 3d of March 1797, ch. 74. But it did not appear in the statement of facts, that Nicholls was then in a state of insolvency : and if he was not, then the priority of the United States did not attach ; or in other words, the act of congress was not applicable to it. It is to this state of the facts that the language of the chief justice was addressed. He added, "had the fact of insolvency appeared upon the record ; that would have enabled

this court to revise the judgment of the supreme court of Pennsylvania." And why? it may be asked. Because upon the statement of facts, the state court must, under these circumstances, have misconstrued the act of congress or disregarded it: for otherwise they would not have given the judgment which was sought to be revised.

That this is the true explanation of this case, does not admit of controversy. In the very next case, Williams v. Norris, 12 Wheat. 117, 124, 6 Cond. Rep. 462; where this very expression, in Miller v. Nicholls, was relied on in argument to establish the position, that it is sufficient to give the court jurisdiction, that the record should show that an act of congress was applicable to the case; the chief justice gave the very explanation of it which is now insisted on; and added, "had the record shown that this was a case of insolvency, so that an act of congress applied to it, that act must have been misconstrued or its obligation denied, when the court decreed the money to Pennsylvania: and the court were of opinion that the act could not be evaded by the omission to refer to it in the judgment, or to spread it on the record." In the case of Williams v. Norris, this court dismissed the writ of error, because it was not stated on the record that the constitutionality of the act of Tennessee, set up in that case, was drawn in question. In Fisher v. Cockerill, 5 Peters's Rep. 258, the case of Miller v. Nicholls was again cited, and commented on by the chief justice, and the same explanation of the decision was recognized and enforced: and, because the facts did not appear on the record, which would bring the case within the terms of the twenty-fifth section of the act of 1789, the writ of error, in Fisher v. Cockerill, was also dismissed.

But, to proceed with the other cases in their chronological order: the next case was Hickie v. Starke, 1 Peters's Rep. 98. There a motion was made to dismiss the writ of error for the want of jurisdiction. Mr Chief Justice Marshall, in delivering the opinion of the court dismissing the writ of error, said: "in the construction of that section, [the twenty-fifth] the court has never required that the treaty or act of congress, under which the party claims, who brings the final judgment of a state court into review before this court; should have been pleaded specially or spread on the record. But it has always been deemed essential to the exercise of jurisdiction in such a case, that the record should show a complete title under the

treaty or act of congress, and that the judgment of the court is in violation of that treaty."

The next case was Wilson v. The Black Bird Creek Marsh Company, 2 Peters's Rep. 245, 250. In that case, the chief justice, in delivering the opinion of the court sustaining the jurisdiction, said : " we think it impossible to doubt that the constitutionality of the act [of Delaware] was the question and the only question, which could have been discussed in the state court. That question must have been discussed and decided. This court has repeatedly decided in favour of its jurisdiction in such a case. Martin v. Hunter's Lessee, Miller v. Nicholls, and Williams v. Norris, are expressly in point. They establish, as far as precedents can establish any thing, that it is not necessary to state in terms on the record, that the constitution or a law of the United States was drawn in question. It is sufficient to bring the case within the provisions of t_ twenty-fifth section of the judicial act, if the record shows, that the constitution or a law or a treaty of the United States, must have been misconstrued, or the decision could not have been made ; or, as in this case, that the constitutionality of a state law was questioned, and the decision was in favour of the party claiming under such law."

The next case was Satterlee v. Mathewson, 2 Peters's Rep. 380, 410: where Mr Justice Washington, in delivering the opinion of the court sustaining the jurisdiction, after citing prior cases, said : " if it sufficiently appear from the record itself, that the repugnancy of a statute of a state to the constitution of the United States was drawn into question, or that that question was applicable to the case ; this court has jurisdiction of the cause under the section of the act referred to, although the record should not in terms state a misconstruction of the constitution of the United States, or that the repugnancy of the statute of the state to any part of that constitution was drawn into question." But he immediately adds, as explanatory of his remarks, and to correct their generality : " now, it is manifest from this record, not only that the constitutionality of the statute of the 8th of April 1826 was drawn into question, and was applicable to the case ; but that it was so applied by the judge, and formed the basis of his opinion to the jury, that they should find in favour of the plaintiff, if in other respects she was entitled to a verdict. It is equally manifest that the right of the plaintiff to recover in that action depended on that statute.

The next case was Harris v. Dennie, 3 Peters's Rep. 292, 302 ;

where the court, in answer to the objection of a want of jurisdiction, because it did not appear upon the record that any question within the twenty-fifth section arose in the state court upon the special verdict, said : " it has been often decided in this court that it is not necessary that it should appear, in terms, upon the record that any such question was made. It is sufficient, if, from the facts stated, such a question must have arisen, and the judgment of the state court would not have been what it is if there had not been a misconstruction of some act of congress, or a decision against the validity of the right, title, privilege, or exemption set up under it."

The next case was Craig v. The State of Missouri, 4 Peters's Rep. 410 ; in which Mr Chief Justice Marshall, in affirming the jurisdiction of the court, said : " to give jurisdiction to this court it must appear in the record : 1. That the validity of a statute of the state of Missouri was drawn in question, on the ground of its being repugnant to the constitution of the United States. 2. That the decision was in favour of its validity." And again : " there has been a perfect uniformity in the construction given by this court to the twenty-fifth section of the judicial act. That construction is, that it is not necessary to state, in terms, in the record, that the constitution or a treaty or law of the United States has been drawn in question, or the validity of a state law on the ground of its repugnance to the constitution. It is sufficient if the record shows that the constitution, or a treaty or law of the United States might have been construed, or that the constitutionality of a state law must have been questioned ; and the decision has been in favour of the party claiming under such law."

In Fisher v. Cockerill, 5 Peters's Rep. 255 ; the cases of Harris v. Dennie, and Craig v. The State of Missouri, were reviewed, and the doctrine stated therein confirmed ; and Mr Chief Justice Marshall, after that review, added : " we say, with confidence, that this court has never taken jurisdiction unless the case, as stated in the record, was brought within the provisions of the twenty-fifth section of the judicial act."

In Davis v. Packard, 6 Peters's Rep. 41, 48 ; Mr Justice Thompson said : " it has also been settled, that in order to give jurisdiction to this court under the twenty-fifth section of the judiciary act, it is not necessary that the record should state, in terms, that an act of congress was in point of fact drawn in question. It is sufficient if it appears from the record that an act of congress was applicable to the

case, and was misconstrued ; or the decision in the state court was against the privilege or exemption specially set up under such statute."

In the Mayor of the City of New Orleans v. De Armas, 9 Peters's Rep. 234 ; where the suit was dismissed for want of jurisdiction : the chief justice, in delivering the opinion of the court, said : "we can inquire only, whether the record shows that the constitution, or a treaty or a law of the United States has been violated by the decision of the state court. To sustain the jurisdiction of the court in the case now under consideration, it must be shown that the title set up by the city of New Orleans is protected by the treaty ceding Louisiana to the United States, or by some act of congress applicable to that title."

These are all the cases, it is believed, in which the construction of the twenty-fifth section of the judiciary act has been made matter of controversy ; and they extend over a period of more than twenty-five years.   They exhibit an uniformity of interpretation of that section, which has never been broken in upon.   They establish, so far as a course of decision can establish, the propositions already stated in the early part of this opinion.   The period seems now to have arrived in which the court should, upon a full review of all the cases; with a view to close, if possible, all future controversy on the point ; reaffirm the interpretation which they have constantly maintained.   It is, that to bring a case within the twenty-fifth section of the judiciary act, it must appear upon the face of the record : 1st. That some one of the questions stated in that section did arise in the state court.   2d. That the question was decided by the state court, as required in the same section.   3d. That it is not necessary that the question should appear on the record to have been raised, and the decision made in direct and positive terms, ipsissimis verbis ; but that it is sufficient if it appears by clear and necessary intendment that the question must have been raised, and must have been decided in order to have induced the judgment.   4th. That it is not sufficient to show that a question might have arisen or been applicable to the case ; unless it is farther shown, on the record, that it did arise, and was applied by the state court to the case.

If with these principles in view we examine the record before us, it is very clear that this court has no appellate jurisdiction.  No question appears to be raised, or decision made by the state court within the purview of the twenty-fifth section.   The statement of

[Crowell v. Randell.    Shoemaker v. Randell.]

facts upon which the judgment against the garnishee (the plaintiff in error) was given, presents no question as to the constitutionality of the laws of Delaware relative to garnishees; and no right set up by the Chesapeake and Delaware Canal Company, under their charters, which has been infringed, in violation of the constitution of the United States.  So far as we can perceive from the record, the judgment had no reference to any constitutional question whatsoever; but proceeded upon general principles of law, applicable to cases of garnishment.  If, indeed, we were compelled to draw any conclusion, it would be that the judgment proceeded upon the ground stated at the bar, that the payment of the tolls for which the plaintiff was held liable as garnishee, was a meditated fraud upon the garnishee laws of Delaware, and a violation of the charters and by-laws of the company.  But it is unnecessary for us to draw any such conclusion; since there is a total absence from the record of any question and decision which would give this court jurisdiction.

The judgment of the court is, that the suit must be dismissed for want of jurisdiction.